ROY GILBERT, Appellee, v. W. M. VANDERWAAL, Appellant.

NEGLIGENCE: Contributory Negligence—Automobile Accident.
1  Evidence relating to the conduct of plaintiff in crossing a street between intersecting streets, with resulting collision with an automobile, reviewed, and held to present a jury question on the issue of plaintiff's contributory negligence.

TRIAL: Verdict—$5,000—Excessiveness. Verdict of $5,000 ordered
2  reduced to $3,500, or new trial granted. Plaintiff, a young man of moderate earnings, suffered a broken limb, was confined to the hospital for some eleven weeks, suffered at the time much pain, and an actual pecuniary loss of $1,200, but had apparently fully and permanently recovered from the injury and all suffering therefrom.

*Appeal from Polk District Court.*—W. S. AYRES, Judge.

NOVEMBER 17, 1917.

ACTION for damages resulting from an automobile collision. Verdict and judgment in favor of plaintiff for $5,000. Defendant appeals.—*Affirmed on condition.*

*Coffin & Rippey,* for appellant.

*Stipp, Perry, Bannister & Starzinger,* for appellee.

1. NEGLIGENCE: contributory negligence: automobile accident.

STEVENS, J.—I. Walnut Street extends east and west, and is intersected and crossed by Fifth and Sixth Streets, near the center of the main retail business district in the city of Des Moines. The center of the street is occupied by double street car tracks. About 160 feet west of the west line of the intersection of Fifth and Walnut Streets is an alley, running north and south. The White Shoe Store is on the south side of Walnut Street, the door thereof being 88 feet west of the west intersection of Fifth and Walnut Streets. The Good Block is directly across Walnut Street on the north side, the entrance to which is at the extreme west side, a distance of 81 feet and 8 inches from the west line of Fifth Street at its intersection with Walnut. The distance from the north edge of the north rail of the south street car track to the south curb line of Walnut Street is 20 feet, and the distance between the north and south rails of the south street car track is 5 feet and 1 inch.

Shortly after 9 o'clock A. M., May 6, 1914, plaintiff was struck by defendant's automobile, knocked down, and the right wheel ran upon his left leg, fracturing the femur near the junction of the lower and middle third. Plaintiff testified concerning the matter as follows:

"I started across the street, I think, about half way between the alley and the street intersection of Fifth and Walnut. That was on the south side of the street where I

started over and along about the White's Shoe Store, and
I started across and I got about somewhere near the center
of the street, and the street car cut me off there. The street
car came a way, and it stopped. I was crossing right where
the street car stopped to let off passengers, and I was about
the center of the street car, and this street car stopped to
discharge passengers; and I raised to my tiptoes and looked
to see, to take notice whether it was going to move on quick,
or stop to discharge a number of passengers. If it was go-
ing to move right away, I would have waited, because the
entrance to the Good Block was right in my line; but I seen
it was going to discharge a number of passengers, so I
started going east, coming around the car where I got
passed, and I must have been near the back end of the car,
and I was struck in the back of both of my limbs with the
fender of an automobile, and I realized my danger, and I
attempted to throw my body and roll as much as possible
to get out of the way. I did throw my body clear of the
automobile to the south, which was about on the street car
track where I was struck, and I threw myself, and my head
was lying to the south and my limbs to the north, and the
automobile ran up on this limb right here. It was my left
limb. It struck me about half way between the knee and
hip. I presume on the left limb. The automobile did not go
over the limb, it ran just up to the limb. Anyway, he backed
off of me, clear of me, but I am not sure it ran upon the
limb, but part of the way on it; anyway, when he ran up
on the limb, the bone held up the weight of the car for an
instant, and then after it stopped there, the bone gave way
and it cracked. I could hear it plainly. * * * I felt the
pressure of the automobile as it struck me on the back of
both limbs, and I went over on the pavement. I presume
it was the fender struck me. I did not notice it, but there
was a sore spot. The first thing I felt was the automobile
striking me below the hips. Then I threw myself sidewise

and landed on the pavement, face up. I imagine I jumped when I threw my body 6, 8 or 10 feet. I jumped east and south. When I was picked up, my body was south of his automobile."

Plaintiff further testified that he looked and did not see defendant's car, and that defendant gave him no warning, and, in answer to a question, stated that the reason therefor was that he did not see him. Plaintiff further testified that there were two automobiles standing near the south curb about 30 feet apart, when he started to cross the street; that he stepped off the curb near the west automobile, and started across the street from a point near the center of the distance between them; that the east automobile was about 20 or 25 feet from the alley; that he noticed but one street car.

Dr. Hanson, a dentist occupying rooms in the Good Block, testified that he was at the time in his office, at a point about 22 feet west of Fifth Street and 25 or 30 feet above the sidewalk; that he saw plaintiff attempt to cross the street and defendant's car collide with him; did not hear defendant sound warning as his car approached plaintiff; did not remember definitely whether there was a street car standing near the place of the accident or not, but testified that, if the center of the street car was directly south of the entrance to the Good Block, he could not have seen the accident, but if the rear end was near the entrance, he could see it. Witness saw the automobile coming down the street, and testified that at the time of the collision defendant was looking north.

It is conceded in the testimony that there were two automobiles at the time standing near the south curb of Walnut Street, the only conflict in the testimony upon this point being as to the exact location thereof. Dr. Hanson was the only witness called who saw the accident. Several other witnesses testified that they arrived on the scene im-

mediately after it occurred.

W. B. Emerson testified that he was standing on the corner of Fifth and Walnut, and, upon hearing a man make a noise, turned, saw him reel and fall; went at once to him and found plaintiff lying on the pavement, with the automobile close to him and his feet over the south rail; the north wheels of the automobile were about the center of the track; heard defendant say that the reason he did not give plaintiff warning was that he did not see him. Witness and defendant put plaintiff in the car and took him to the hospital

A. U. Coates testified that he saw a west-bound street car standing on the north side of the street, and plaintiff lying at or near the south rail of the south street car track; that the rear end of the street car was about the opening or entrance to the Good Block; that there were no automobiles or vehicles at the curbing immediately south of the place where the accident occurred; that the nearest automobile was about 12 feet west of the accident; did not know how far west the second car was; that the accident happened about in front of Field's or White's Shoe Store; heard defendant say that he did not see plaintiff in time to give warning of his approach.

W. E. Evans testified that his attention was attracted by the appearance of defendant's car; that the defendant was driving at the rate of 5 or 6 miles an hour; saw defendant suddenly rise up in the car and thought he had struck something; could not see the front wheels of the automobile; that he went to the scene of the accident; that the automobile was astride the south rail of the street car track; that he saw two street cars standing on the north side of the street; that the accident happened a little bit east of the entrance of the White Shoe Store; that, on account of the noise, could not say whether defendant sounded a warning of his approach or not. Witness was about 30 feet west and 24 feet south

of the place of the accident. This witness further testified:

"Q. It [the automobile] was going directly east? A. Well he was going a little bit catacornered, from the north side of the street, I think. The car was, I think, astraddle of the south rail of the four tracks. Q. He was going, then, in a southeasterly direction? A. Angling a little to the southeast. I think he came from the north side of the street. I don't know whether he was clear over in front of the cars that were standing there or not. Q. You noticed street cars on the north side? A. There were two street cars standing there. I couldn't say whether more or not. Q. You think Vanderwaal came down in front of these in crossing, or almost in front? A. Yes, sir; angling a little bit more to the south. Q. When he came to these cars, he turned to the south? A. I just saw him about the time he came to the front end of the car standing in front, passing west."

Defendant, called as a witness in his own behalf, testified as follows:

"I live in Des Moines, and am the defendant in this case. On or about May 6th, I was driving a 1914 model Chalmers-Six automobile down Walnut Street in an easterly direction, between Fifth and Sixth on the south side of the street. I was going down Walnut Street from Sixth to Fifth, and I just passed the alley, and a man came out of the alley and started across the street ahead of me. He came from the south out of the alley from the south, and was going across Walnut Street. He was going across north. He started across the street, and the street car pulled in front of him, and he couldn't get across; so he started walking up alongside of the street car, and I blew my horn several times. I know of three times at least I blew it, and he looked around, and I knew he had seen me; so I started around him, and of course he would be naturally on my left side, and then as I went around him I watched him, and my fender stuck out, because there was not much room, and

there was a car at the curb here on this side and I would not
have much room to drive through, and just as I went around
him I watched to see that my fender did not hit him, and
I looked up, and just as I did, Mr. Gilbert stepped from be-
hind an automobile, and it was his first or second step from
the automobile when my right fender caught him right across
there (showing), and pushed him over.

"I had a large-sized Klaxon horn on that automobile
at that time.  I blew that horn when I saw the man walk
out of the alley.  I blew it three times I know, and he did
not turn around and signify that he saw me, and I did not
want to pass him until he knew I was going by him, because
he was between the street car and me.  The Klaxon horn
has a large bell, or funnel, that the sound comes out of, and
inside there is a motor there and a ratchet welded on its
diaphragm, and every time it hits the diaphragm it makes a
noise, and hits it probably several times a minute.  It is a
continuous noise as long as you press down on the button.

"There were two street cars standing on the north track
there.  The street car farthest west pulled just up to the
middle of the alley, I should say.  I would not say for sure,
because I was right at the side of it, and I don't know
whether the front end was opposite the alley or the back
end was opposite the alley, but the front end was very near
the alley.  I couldn't say for certain the approximate dis-
tance between that car and the car immediately following,
but they were pulled up close, probably only the fender in
between, and may be a foot or two more.  Mr. Gilbert
bumped into my automobile when it was very near the back
end of the first car.  That would be about in front of White's
Shoe Store." * * *

"Q.  Now, immediately after you saw or you felt the
car bump into Mr. Gilbert, what did you then do?  A.  Well
I was stopping the car at that time.  I started to stop it just
before it bumped into him.  Q.  How soon before you struck

him did you observe Mr. Gilbert in your path? A. I would say it was approximately the fraction of a second. I was only about a foot and a half from him, I should say, when I saw him. Q. State to the court and jury what you observed about Mr. Gilbert at the time you first saw him. A. When he stepped out, as he stepped out from behind the car, he was looking up at the Good Block. Q. And was there any obstruction between Mr. Gilbert and yourself, or did he do anything which would obstruct the possibility of his observing you coming? A. I don't understand your question. Q. Was there any reason why Mr. Gilbert couldn't see you coming? A. I do not see why there should be any. There was nothing between he and I in the street. Q. Was there any automobile ahead of you which had preceded you down the street in the same direction? A. Not one,—not very close. That is, I did not see any close. Q. What did you do when you first saw this other party coming out of the alley and heading across the street? A. I was blowing the horn for him to get out of the way, and while I had slowed down to almost a crawl, I would not have to completely stop before he heard me. Q. When did you stop the car finally,— what, as far as you know, was the position of the front of the car in relation to Mr. Gilbert? A. He yelled 'Get off,' and I backed up. I supposed I was upon his foot. Q. You say he yelled 'Get off?' A. Yes, sir. Q. Did you immediately proceed to back up? A. Yes, sir, sure.    *    *    *

"At the time of the collision, I was going in a slightly southern direction, but mostly east. I have had considerable experience in driving automobiles. Going at 5 miles an hour, I would say you could stop in possibly 7 to 10 feet, according to circumstances. When I observed Gilbert that day, I put on the brake and threw out the clutch. I stopped my car that day in from 7 to 9 feet. Gilbert stepped out into the street from between these two automobiles, and when he stepped out, he was looking up at the Good Block. The only

time I saw Gilbert was just before the accident happened, and that was after I had avoided a collision with the man that came out of the alley. Gilbert had his head in the air, and was looking up towards the Good Block. He said he. was looking for Dr. Hanson's sign, which is in the Good Block. He said this when we were going to the hospital. · He was looking up to locate Hanson's office in the building. When I saw him looking there, it was too late to give a warning. I did not have time to give a warning before I struck him, after he stepped from behind the car. These two street cars were standing on the north side of the street when this accident happened. The distance from the place where I struck Gilbert to the south curb line of Walnut Street would be about the width of an automobile. He was just outside of those automobiles that were standing on the south side of the street. He was going about due north. My fender first struck Gilbert. Just as he stepped out from behind the automobile, he started to take another step, and hit the corner of my car and went down. He did not jump, because the wheel carried his left leg right down under."

S. M. Block, called on behalf of defendant, testified that he came out of the alley and started across the street to the east immediately before the accident; that he was intercepted by a street car, and started to go around the east end of it, when another car pulled up so close that he could not do so; that he then started east around the second car, when he heard an automobile approach; heard the driver blow the horn, whereupon he moved closer to the street car; that he saw the automobile pass on his right side going east; heard the driver apply the brakes, and saw the automobile stop within a distance of one half of its full length; saw plaintiff lying on the track in about the same position as described by the other witnesses; that the automobile was traveling from 5 to 8 miles an hour; that it was not going

very fast. The accident occurred near the rear end of the rear street car.

H. P. Daly testified that, immediately preceding the accident, he had been standing at the front window of his office in the Clapp Block, at the southwest corner of Fifth and Walnut; that he saw defendant driving east at about 5 or 6 miles per hour; that he moved from the window a moment, when he returned to the window and saw defendant and another man picking up somebody from the pavement; that he heard a noise made by the application of the brakes; thought there were two large automobiles and a Ford near the south curb of Walnut Street, and that the top of the Ford was up.

Richard Howard testified that, when he arrived at the scene of the accident, plaintiff had been picked up; that the front wheel was north of the south rail of the south track; that a car stood by the curbing, immediately south of, and within a foot or two of, defendant's car.

The foregoing is a substantial statement of the material points in the testimony respecting the injury. Six grounds of negligence were alleged in plaintiff's petition, as follows:

(1) That defendant negligently operated his automobile in a crowded street at such a high rate of speed that he was unable to stop the same in time to avert the collision; (2) that he failed to exercise ordinary care in approaching the intersection of Walnut and Fifth Streets at a high rate of speed at a point where the street car was standing to let off passengers, and at a point where pedestrians were apt to be; (3) in approaching the crossing without sounding his horn or warning plaintiff of the approach of his automobile; (4) in failing to maintain a lookout in front of his car for plaintiff and pedestrians in said street; (5) in failing to have his car under control so that he could stop same in time to avert the collision with plaintiff; (6) in failing

to stop or divert the course of his automobile, and thereby prevent the same from colliding with plaintiff.

The defendant for answer denies the allegations of plaintiff's petition, and avers that whatever injury plaintiff received was due to his own negligence directly contributing thereto, and without any negligence on the part of the defendant.

The two principal questions argued by counsel upon this appeal are that plaintiff's injuries were due to his own negligence, and that the verdict of the jury is excessive.

The rate of speed at which the automobile was at the time being operated was not necessarily negligent, although defendant was approaching close to a crossing of a busy street, and was in the immediate vicinity of two street cars probably discharging passengers on the opposite side, and was bound to operate his automobile at such a rate of speed and in such a manner as to have the same under such control that it could be stopped within a reasonable distance, in order to prevent danger of colliding with pedestrians. His view on Walnut Street from the alley east to the intersection of Fifth Street was unobstructed, and a pedestrian coming upon the street at any point between the automobile and Fifth Street could have been readily seen by defendant, if looking in that direction. The testimony as to whether defendant sounded a warning of his approach close to defendant is not wholly without conflict. Defendant, according to the testimony of plaintiff and two witnesses, admitted that he did not see plaintiff in time to give him warning. Dr. Hanson and another witness testified that they did not hear defendant sound his horn, but they do not appear to have been observing or listening closely as to whether the same was sounded or not, and one witness testified that he might not have heard it because the noise was so great at that point.

The witness who testified that he came out of the alley

and started to cross the street when intercepted by a street car, said that defendant did sound his horn, which he plainly heard, in time for him to get out of the way. At this time, this witness and plaintiff were apparently not very far apart, but defendant had not then seen plaintiff. Plaintiff testified that he looked while crossing the street, and did not see the approach of defendant's automobile, and one witness testified that defendant came, apparently, from the north side of the street in front of the street car; so that the jury might have found that defendant's automobile was not in view at the time plaintiff claims to have stood by the car for the purpose of observing whether it would pass on quickly, or be delayed a sufficient length of time to discharge several passengers.

The evidence shows that plaintiff's automobile was proceeding at a rate of from 5 to 8 miles per hour, and that, after defendant applied the brakes, it traveled a distance equal approximately to its length. According to the testimony of defendant, he turned his car slightly to the southeast, to avoid a collision with the witness who came from the alley, and in doing so ran very close to another car standing on the south side of the curb; that he was looking to see whether the left fender of his car had struck the witness, and therefore did not see plaintiff in time to avoid the injury. Defendant, however, claimed that plaintiff stepped in front of his car from the south side of the street from behind an automobile, and had taken not to exceed two steps when he struck him. The automobile, when the witnesses arrived, was astride the south rail of the south street car track, and plaintiff was lying with his head to the west and his feet over the south rail.

There was evidence from which the jury might have found that plaintiff was 15 feet east of the automobile when he started to cross the street, and that there was ample room for defendant to turn his car to the south and avoid the col-

lision.  Dr. Hanson said defendant was looking north, and
he admits that he was looking, immediately before the col-
lision, to see whether he had struck the other man.  And
there was some evidence which, if believed by the jury, would
indicate that defendant may not have been in view of plain-
tiff when he started across the street, or before he turned to
go east.  Defendant claimed, as above stated, that plaintiff
was, at the time, looking up toward the sign of Dr. Hanson
on the Good Block, and could have seen defendant approach-
ing, had he been in the exercise of ordinary care.  Plaintiff
denies this, and testified that he knew where Dr. Hanson's
office was, and that he was walking east, which brought
his back to defendant, for the purpose of going around the
rear end of the street car and thence to Dr. Hanson's office.

We do not feel warranted in this case in saying that
the evidence so clearly establishes negligence upon the part
of plaintiff that there is no room for difference of opinion
among fair-minded men in relation thereto, and that the cause
was not properly submitted to the jury.  *Perjue v. Citizens'
Electric Light & Gas Co.*, 131 Iowa 710; *Delfs v. Dunshee*,
143 Iowa 381; *Holderman v. Witmer*, 166 Iowa 406; *Bell v.
Incorporated Town of Clarion*, 113 Iowa 126; *Clay v. Iowa
Telephone Co.*, 178 Iowa 67.

What is said above practically disposes of every ques-
tion suggested by counsel, except the contention that the
verdict was excessive.  We think there was sufficient evi-
dence to require the submission of the case to the jury.

2. TRIAL: ver-
dict: $5,000:
excessiveness.

II. Plaintiff was taken to a hospital in
the city of Des Moines immediately after the
injury complained of, where three physicians
attended him.  His injuries are described as an oblique frac-
ture of the femur at the junction of the lower and middle
third.  The morning after the fracture was reduced, the
physicians found that the broken parts were not in apposi-

tion. An anesthetic was administered to plaintiff, the bones placed in proper position, and fastened by means of a Lane plate. The limb was placed in a plaster cast; and he remained in the hospital for about 8 weeks, when he returned home. He returned to the hospital again in about a week, when it was discovered that the Lane plate was broken, and the broken bone had not united. A second operation was performed, and two large-sized Lane plates were applied. The plates used were long, thin plates of steel, and were screwed tightly to the bone for the purpose of holding it in place. These plates have not been removed, but, as the broken parts of the bone have fully united, these plates are not now necessary, but the removal thereof would require an operation, which is not advised. Plaintiff stated that he suffers no inconvenience on account thereof. Plaintiff claims, and his physicians also testified, that he suffered a great deal of pain, was given an anesthetic when each operation was performed, was confined in the hospital about 11 weeks altogether, and walked with the aid of a crutch after he finally left the hospital, until about the month of October.

At the time of the trial, according to the testimony of medical witnesses, there was an excess of callous about the fractured place, and they testify that same is being absorbed to some extent, but may not all ultimately disappear; that, while some friction results therefrom, and the free movement of the muscles is, to a slight extent, impaired, the callous will eventually become solid bone, smooth, and no inconvenience will be felt on account thereof. The bone is not perfectly straight, but the extent of this imperfection is not shown. Plaintiff claimed to still, occasionally, feel some pain as the result of the fracture; that he cannot walk as fast as formerly, or stand on the limb for a considerable length of time without inconvenience; that the movement of his leg is impaired to some extent, and he is

unable to assume some positions in his work that he could
before the injury.  The union of the broken parts of the
bone is sound and secure.  It does not appear that he is
lame, or that he will in the future suffer any material in-
convenience or discomfort on account of his injury.

He was 29 years of age at the time of his injury, and
had a life expectancy of 30 years.  He was earning $3 per
day at his trade, which was that of a marble cutter.  After
he was able, he returned to work for his former employer
at slightly reduced wages.  It is not shown, however, that
the reduction in wages was due to his injury.  Shortly there-
after, he engaged in the business of repairing furniture in
the city of Des Moines, and continued therein until the time
of the trial.

He expended for medical and hospital services about
$500, and was unable to work for about 10 months, making
his actual loss in the neighborhood of $1,200.  Plaintiff is
entitled to compensation for the injury suffered, so far as
that is possible, payment of his medical and hospital ex-
penses, for loss of time, pain and suffering, past and future,
and some other elements of recovery.  The jury returned a
verdict of $5,000 in his favor.  In our opinion, in view of
the nature of the injuries, the substantial recovery there-
from, the earning capacity of plaintiff at the time of the in-
jury, his present earning capacity and ability to carry on
the business in which he is now engaged, this sum is exces-
sive.  Plaintiff does not claim to have suffered very great
inconvenience while working at his former trade, and claims
to have abandoned the same because his employer did not
pay him satisfactory wages, and not because he could not
do the work.

We are reluctant to reverse this case on account of an
excessive verdict, and if plaintiff will remit $1,500 of the
verdict within 60 days from the date of filing this opinion,
the judgment for the balance will be allowed to stand.  In

the absence of such election within said time, the judgment of the lower court will be deemed reversed, and the defendant granted a new trial.—*Affirmed on condition.*

GAYNOR, C. J., WEAVER and PRESTON, JJ., concur.